CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 3 1 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| COMMONWEALTH GROUP-<br>WINCHESTER PARTNERS, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:07CV00024 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| WINCHESTER WAREHOUSING, INC. | ) | |
| | ) | |
| and | ) | By: Hon. Glen E. Conrad |
| | ) | United States District Judge |
| SILVER LAKE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the defendants' motion for summary judgment on the

sole remaining claim of breach of express contract as well as the plaintiff's motion in limine. For

the reasons set forth in detail below, the defendants' motion will be granted, and the plaintiff's

motion will be denied as moot.

## FACTUAL BACKGROUND

In 2003, Commonwealth-Winchester Partners ("Commonwealth") and the defendants,

Winchester Warehousing, Inc. and Silver Lake, LLC (collectively "WWW" or "the defendants"),

began negotiating for the sale of approximately 40 acres of a 70 acre tract owned by the

defendants in Winchester, Virginia, near the intersection of Interstate 37 and U.S. Route 50.

Both parties understood that the property would be developed as a shopping center to include a

Wal-Mart Supercenter. Shaun Petracca, who had initially approached the defendants about the

sale, acted as a buyer's agent during the process of negotiation and was ultimately compensated

directly by Wal-Mart. On June 27, 2003, James R. Wilkins, Jr.[1] and C. Robert Solenberger[2], acting on behalf of the defendants, entered into a Rezoning Request Proffer with Frederick County in which they agreed to perform certain improvements in and around the property after the change in zoning from agricultural to commercial. In the negotiations for the sale of the tract, Wilkins represented the defendants, and Timothy E. Scoggin, the president of Commonwealth Company, acted on behalf of the buyer.

On July 14, 2003, WWW and Commonwealth Properties Acquisition, LLC entered into a letter agreement for the "Proposed Sale and Purchase of Real Estate." In that agreement, self-described as "the preliminary agreement and understanding between WWW, LC, hereinafter referred to as 'Seller,' and Commonwealth Properties Acquisition, LLC, hereinafter referred to as 'Buyer,'" the parties agreed to the following relevant terms:

1. The sales price of said 40 acres shall total the sum of Nine Million Two Hundred Thousand and 00/100 Dollars, ($9,200,000.00). Said sum represents the purchase price for the real estate, as well as the development costs associated with the Buyer and Seller's intended use for the Property. The payment of said sum to the Seller shall be in a manner that is acceptable to both Seller and Buyer.

2. This agreement shall be binding on both Buyer and Seller, their heirs, successors and assigns, for a period of 45 days, starting on the date this document is fully executed. It is clearly expressed and understood by all parties that the term of this letter is to be used for the preparation of the real estate purchase agreement, acceptable to both Buyer and Seller, outlining all terms and conditions of this proposed real estate purchase. **The Seller agrees not to accept any other offer for the Property during the 45 day term, or any extension thereof.**

(Emphasis in original). The letter agreement also provided that the parties had the option to

---

[1] James R. Wilkins, Jr. worked with Silver Lake, LLC, a real estate company he owned with his son, Richie Wilkins, III. Wilkins is primarily in the shoe business, but also develops residential real estate and has held several commercial properties.

[2] C. Robert Solenberger is the primary owner of Winchester Warehousing, Inc.

2

extend the term. The letter agreement was prepared, in part, because Wal-Mart had indicated

that it would visit the site only after such an agreement was in place between the parties.

After a further period of negotiation, Commonwealth-Winchester Partners, LP and the

defendants signed the Real Estate Purchase Agreement on September 17, 2003. The Real Estate

Purchase Agreement was drafted by Wendell Thomas, the attorney for Commonwealth. As the

court has previously stated in its memorandum opinion dated August 31, 2007, the proper

interpretation of that agreement, in the context of two related documents, is at the heart of this

case. In relevant part, the Real Estate Purchase Agreement states as follows:

> 1. PURCHASE AND SALE AGREEMENT: Seller hereby agrees to sell and the Buyer hereby agrees to buy, on the terms and conditions of this Agreement, the fee simple interest, including both surface rights and mineral rights, in and to that certain real property of Seller located in the County of Frederick, State of Virginia, as outlined in red on the drawing that is attached hereto as Exhibit A (the "Property"). The parties agree that the Property shall include a new internal road (the "Boundary Road") [which] shall be located to the west of the Property and shall also include all property that is required to be dedicated for right-of-way as a result of the Proffer Work, as defined below. The Boundary Road shall be located so that <u>after</u> deducting any property that will be in the right-of-way of the Boundary Road or that will be dedicated as right of work as a result of the Proffer Work, the Property will be a minimum of forty (40) acres.

> . . .

> 3. PURCHASE PRICE. The purchase price for the Property shall be the sum of Two Hundred Thousand and 00/100 Dollars ($200,000) per acre. It is contemplated that there will be forty (40) acres; however the site plan has not been finalized, and based upon said site plan, the exact acreage in the property (to the nearest 1/1000th of an acre) determined by a survey to be performed by a surveyor or engineer licensed in the State of Virginia. In the event the survey reveals an amount in excess of forty (40) acres is needed, then the excess amounts will be prorated at $200,000 per acre carried to the thousandth of an acre, and if less than forty (40) acres, then the purchase price will be adjusted downward accordingly. Seller will use its best efforts to insure that the acreage equals forty (40) acres; however, the alignment with the intersection of Route 50 may cause it to exceed that amount.

> 4. OFF-SITE WORK. In addition to paying the Purchase Price, the Buyer

3

shall perform the off-site work that is described in the summary of proffers that is attached as Exhibit B (the "Proffer Work"). In addition, to the extent that the Proffer Work cost less than $1,200,000.00, the Buyer shall spend the difference between the cost of the Proffer Work and $1,200,000.00 in constructing the Boundary Road, provided, however, in no event shall the Buyer be required to construct the Boundary Road beyond the Northwest corner of the Property.

. . .

      16.    ENTIRE AGREEMENT. This Contract and the documents referred to in this Contract constitute the entire agreement between the parties, and there are no other conditions, covenants or agreements which shall be binding between the parties.

The Agreement also provides that it shall be governed by and interpreted in accordance with Virginia law. On June 1, 2004, Commonwealth-Winchester Partners, L.P. properly assigned its interest in the Real Estate Purchase Agreement to Commonwealth Group-Winchester Partners, L.P., the plaintiff in the instant case.

Exhibit B to the Real Estate Purchase Agreement lists the Proffer Work required for the property, in accordance with the rezoning agreement with the county. The total is divided between WWW and Winchester Medical Center ("WMC"), which owned adjoining property. The total cost of the Proffer Work was estimated in 2003 dollars at $1,619,544, with WWW responsible for $868,024, WMC responsible for $516,200, and the Virginia Department of Transportation responsible for the remainder. These estimates were provided by Charles Maddox, the project engineer retained by the defendants in connection with the upzoning of the property and later retained by Commonwealth to assist with its performance of the Proffer Work. By the summer of 2004, however, the estimates for the share of the Proffer Work not allocable to the WMC or the Virginia Department of Transportation had risen to approximately $1.6 million.

Prior to the closing, WWW, which remained the legal owner of the property at that time,

4

entered into a Memorandum of Understanding with WMC which set forth a cost sharing arrangement for the cost of the road improvements that comprised the Proffer Work. The Memorandum of Understanding, dated July 22, 2004, provided that "WMC shall be liable for 31.9% of the external road improvement estimated costs to include change orders and WWW shall be liable for 68.1% of the external road improvement estimated costs to include change orders."

Around the same time, the parties became aware that the storm water pipes for the 40 acres being purchased by Commonwealth could be sized smaller and purchased at a lower price than if they were sized to accommodate both the 40 acre parcel as well as the 30 acres retained by WWW. As a result, Wendell Thomas drafted an agreement whereby the defendants agreed to pay the difference in price for the larger sized pipes. This side agreement was dated July 24, 2004 and was signed by both Wilkins and Solenberger, who added a handwritten clause which set forth a cap of $100,000. The agreement was apparently not signed by a representative of Commonwealth.

Commonwealth and WWW finally closed on the sale of the property on August 26, 2004. On August 31, 2004, WWW and Commonwealth entered into a second side Agreement which recited that the parties had contracted for the sale of the property, that WWW and WMC had made "certain proffers . . . in connection with the Property and in connection with additional adjoining property that is owned by Winchester Warehousing - Silver Lake and by the WMC," and that WWW and WMC had entered into the Memorandum of Understanding described above. The Agreement also included the following recital that bears directly on this case:

WHEREAS, under the terms of the [Real Estate Purchase] Agreement, Commonwealth

5

Group has agreed to perform the work necessary to satisfy the Proffers, with the responsibility for the payment for such work being allocated to Commonwealth Group and Winchester Warehousing - Silver Lake in the Agreement; [].

The August 31, 2004 Agreement went on to state that WWW would collect the sums due under the terms of the Memorandum of Understanding from WMC and would remit those sums to Commonwealth when due. As an additional guarantee, if WMC failed to make payment as required, WWW itself would make the payments due and would then attempt to collect the relevant sums itself from WMC.

At a meeting on September 27, 2005, representatives of the plaintiff, including Milton Turner, the chief manager of Commonwealth, and Tim Scoggin, requested that the defendants pay their "fair share" of the total cost of the Proffer Work which was not reimbursed by WMC. The defendants refused to make any such payments. On January 26, 2007, Milton Turner sent WWW a demand letter in which he stated that the defendants were contractually obligated to pay half of the costs of the Proffer Work in excess of the amount owed by WMC, a total of $2,029,554.87. WWW made no payments to Commonwealth in response to this demand or at any other time.

Commonwealth filed a complaint in this court on March 2, 2007 asserting theories of breach of express contract and quantum meruit. In the amended complaint filed on May 4, 2007, the plaintiff contends that it has now paid for the Proffer Work in the amount of $5,960,513.58. Of that total, WMC is responsible for $1,901,403.83[3] leaving a balance of $4,059,109.75. The plaintiff also added an additional cause of action for mutual mistake and reformation of the contract. In that count, Commonwealth states that the parties intended that its share of the cost of

---

[3] WMC had actually paid $1,592,664.85 of the total owed through the date the complaint was filed.

the Proffer Work would not exceed $1.2 million and requests that, if the court finds that the terms of the agreements between the parties failed to provide for such an allocation, the court should reform the contract to include it on the basis of the parties' "mutual mistaken belief that the cost of the Proffer Work would not exceed $1.2 million."

The defendants then filed a motion to dismiss the amended complaint, a motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure, a motion in limine and a motion for partial summary judgment as to the claim for quantum meruit. The plaintiffs filed a motion for partial summary judgment as to the claim for breach of express contract. After a hearing on August 17, 2007, the court dismissed the plaintiff's claims of mutual mistake and quantum meruit, but permitted the claim for breach of express contract to proceed. The court also denied the plaintiff's Rule 11 motion for sanctions. WWW has now filed a motion for summary judgment, and Commonwealth has filed a motion in limine. The parties presented their arguments on the motions to the court at a hearing on March 20, 2008. These motions are now ripe for decision.

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 127 S. Ct.

1769, 1776 (2007) (internal citations omitted). Furthermore, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly submitted motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. (internal citations omitted) (emphasis in original).

In deciding a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Industries, Inc., 763 F.2d 604, 610 (4th Cir. 1985). When a motion for summary judgment is supported by affidavits or other evidence as provided for in Rule 56, the opposing party may not rest upon the allegations in the pleadings and must, instead, present evidence showing that there is a genuine issue for trial. If the adverse party fails to present such evidence, summary judgment, if appropriate, should be entered. Fed. R. Civ. P. 56(e); Atkinson v. Bass, 579 F.2d 865, 866 (4th Cir.), cert. denied, 439 U.S. 1003 (1978).

## DISCUSSION

## I.      Elements of a Claim for Breach of Contract in Virginia

For a plaintiff to succeed on a claim for breach of contract under Virginia law, it must show: (1) a legal obligation of a defendant to a plaintiff, (2) a violation or breach of that obligation, and (3) a consequential injury or damage to the plaintiff. Hamlet v. Hayes, 641 S.E.2d 115, 117 (2007), citing Caudill v. Wise Rambler, 210 Va. 11, 13, 168 S.E.2d 257, 259 (1969). The interpretation of a contract is a question of law. City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 271 Va. 574, 578 (2006). Virginia applies the "plain meaning" rule which dictates that "[t]he contract is construed as written, without adding terms that were not included by the parties." Id. Therefore, "[t]he law will not insert by construction,

8

for the benefit of a party, an exception or condition which the parties omitted from their contract by design or neglect." Bridgestone/Firestone, Inc. v. Prince William Square Associates, 250 Va. 402, 407 (1995). A court should also attempt to give meaning to every clause of a contract when "its parts can be read together without conflict." Berry v. Klinger, 225 Va. 201, 208 (1983).

If the language of a contract is ambiguous, however, a court may admit parol or extrinsic evidence, "not to contradict or vary contract terms, but to establish the real contract between the parties." Tuomala v. Regent Univ., 252 Va. 368, 505 (1996). See also, Galloway Corp. v. S. B. Ballard Const. Co., 250 Va. 493, 502 (1995) (holding that, in the case of an ambiguity, a court may admit parol and other extrinsic evidence to ascertain the intention of the parties). Whether an agreement is ambiguous is a question of law, not of fact, and an ambiguity exists "when language admits of being understood in more than one way or refers to two or more things at the same time." 252 Va. at 505.

## II.    The Court's August 31, 2007 Memorandum Opinion

The parties were previously before the court on the defendants' motion to dismiss all three counts of the amended complaint. The court ruled that the plaintiff's claims for mutual mistake and quantum meruit should be dismissed under the applicable law. As to Commonwealth's claim for breach of express contract, however, the court found that the agreements in question in this case, when considered together, raise an ambiguity with regard to the responsibility for the payment of the cost of the Proffer Work.

Specifically, the court first held that, if it were to consider only the plain language of the Real Estate Purchase Agreement, Commonwealth would be responsible for the entire cost of the Proffer Work, including any amount in excess of $1.2 million. The court also noted, however,

9

that in the August 31, 2004 Agreement, one of the recitals states that Commonwealth is responsible for performing the Proffer Work, but that payment for the work is allocated between Commonwealth and WWW in the Real Estate Purchase Agreement. Therefore, the court found that the language in the Real Estate Purchase Agreement, which does not mention any allocation between the parties, and the August 31, 2004 Agreement, which states that the Real Estate Purchase Agreement did include some allocation, appear to be inconsistent. As a result, the court held that the agreements, when considered together, are ambiguous, and permitted the parties to submit extrinsic evidence to shed light on the parties' intent in entering into both agreements. Nevertheless, the court noted that such evidence could very well indicate that Commonwealth was responsible for the payment of the full amount of the cost of the Proffer Work in light of the course of dealing between the parties.

III.     **The Purpose of the August 31, 2004 Agreement**

At the hearing on the defendants' motion for summary judgment, the defendants argued that the August 31, 2004 agreement was drafted and signed solely to guarantee payment to Commonwealth of the amounts due for the Proffer Work from WMC. According to the defendants, the parties had originally investigated the possibility of having the Memorandum of Understanding between WWW and WMC assigned to Commonwealth, but they did not want to wait until WMC's next board meeting at which such an assignment would have to have been approved. As a result, Commonwealth and WWW entered into this side agreement which stated, in pertinent part, as follows:

- RECITALS -

WHEREAS, pursuant to the terms of a certain Real Estate Purchase Agreement, dated

10

September 17, 2003 (the "Agreement"), Winchester Warehousing - Silver Lake has contracted to sell a certain 39.9795 acre tract located on Route 50 West in Frederick County, Virginia (the "Property") to Commonwealth Group; and

WHEREAS, Winchester Warehousing - Silver Lake and Winchester Medical Center ("WMC") have made certain proffers (the "Proffers") in connection with the Property and in connection with additional adjoining property that is owned by Winchester Warehousing - Silver Lake and by the WMC; and

WHEREAS, under the terms of the Agreement, Commonwealth Group has agreed to perform the work necessary to satisfy the Proffers, with the responsibility for the payment for such work being allocated to Commonwealth Group and Winchester Warehousing - Silver Lake in the Agreement; and

WHEREAS, WMC and Winchester Warehousing - Silver Lake have entered into a Memorandum of Agreement, dated July 22, 2004 (the "MOU"), under which WMC has agreed that it will pay for a portion of the work that is necessary to satisfy the Proffers; and

WHEREAS, Winchester Warehousing - Silver Lake has agreed that it will collect from WMC the payments for the work on the Proffers that WMC has agreed to pay under the MOU.

NOW THEREFORE, in consideration of the benefits to accrue thereby, the parties agree as follows:

1.      The Recitals are a substantive part of this Agreement.

2.      Winchester Warehousing - Silver Lake hereby agrees that within thirty (30) days after it receives an invoice for such work from Commonwealth Group, it will collect from WMC and pay the Commonwealth Group the payments for the work on the Proffers that WMC has agreed to pay under the MOU. In the event Winchester Warehousing - Silver Lake is unable to collect such payments from WMC within such thirty (30) day period, it will nevertheless pay the amount of such invoice to Commonwealth Group and will then collect the amount of such payment from WMC.

. . . .

The defendants' assertions are supported by a series of e-mails between Shaun Petracca, Tim Scoggin, and Wendell Thomas on August 12th and 13th, 2004. Shaun Petracca sent the following message to Scoggin and Thomas on August 12th at 2:38 p.m.:

11

Jim Wilkins will not be back in the office until 4:00. He is to call me when he gets in.

I spoke to Ben Butler [the attorney for the defendants], discussed the situation, and he said that if there is any other document needing to be signed by the WMC (the hospital) it will probably need to go through two board for approval.

We spoke about a guarantee from Sliver [sic] Lake, LLC & Winchester Warehousing, Inc., stating that they would be responsible for collecting from the Hospital, or would pay it themselves, but he needs to talk with Jim Wilkins to get his thoughts before he could approve any such document.

The [sic] also suggested that an indemnity document may be the answer.?

I believe that in order to accomplish anything soon, we should prepare the document guarantee, stating what we need it to say, and send it to Ben Butler for review. This document would be between Silver Lake & Winchester Warehousing -to-Commonwealth-Group Winchester.

What do you think?

Shaun

<u>See</u> Brief in Support of Defendants' Winchester Warehousing, Inc.'s and Silver Lake, LLC's

Motion for Summary Judgment ("Defendants' Brief"), Exhibit 14. Shaun Petracca then followed

up with a note to Thomas later that afternoon which indicated that he had spoken to both Wilkins

and Scoggin and stated as follows:

. . .

Mr. Wilkins basically said that we could invoice Silver Lake/Winchester Warehousing, C/o WMC, and he could collect from the WMC (the Hospital), via The Memorandum of Understanding between WMC, Silver Lake & Winchester Warehousing.

The parties to the Memorandum wanted to keep it between them intentionally, mainly for the benefit of WMC, so as to keep the reimbursement dollars going to one person.

The solution that Tim and I discussed was to give the invoices to Chuck Maddox (the engineer for all parties), having him break it down, and invoice each respective party.

Tim and I will communicate with Wendell tomorrow after lunch to start discussing how

12

this type of agreement might work.

   . . .

<u>See</u> Defendants' Brief, Exhibit 15. Thomas responded to Shaun Petracca the next day with the

following message, copying Tim Scoggin:

> Shaun
>
> Based on my conversation with Tim, attached is a draft of the Agreement. As drafted, WW/SL agree that within 30 days after receiving an invoice from Commonwealth for work which WMC is required to pay, they will collect the money from WMC and pay the money to Commonwealth. If WMC doesn't pay within the 30 day period, WW/SL agrees to pay the money and then collect from WMC.
>
> I have discussed this with Tim and everything (including the 30 day period) is okay with him.
>
> Wendell

<u>See</u> Defendants' Brief, Exhibit 16.

    After these exchanges, Shaun Petracca sent the draft agreement, which was ultimately

signed on August 31, 2004, to Jim Wilkins on August 13, 2004 with the following note:

   . . .

> The lender would like to have a little more clear understanding of how Commonwealth will be reimbursed for work performed on behalf of WMC Silver Lake & Winchester Warehousing.
>
> I have attached the draft document. Ben Butler has the same via e-mail. This should not hold up the transfer of dollars, but is important to have an acceptable copy executed as soon as possible.
>
>    . . . .

<u>See</u> Defendants' Brief, Exhibit 17. At his deposition, Tim Scoggin did not appear to specifically

remember the various e-mails or discussions concerning the agreement, but when asked if he was

13

aware of Commonwealth's concern with regard to ensuring that it could collect WMC's share of the Proffer Work, he responded "I was aware at the time of a concern related to the mechanics of this, but that would have been the extent of my involvement." <u>See</u> Defendants' Brief, Exhibit 29 at 61:23-62:7.

It is apparent from the extrinsic evidence that the sole intent of the parties in drafting and signing the August 31, 2004 Agreement was to guarantee the payment to Commonwealth of the sums due from WMC under the Memorandum of Understanding between WMC and WWW. In fact, when the court stated at the hearing on this matter that it appeared that the agreement was intended for this purpose, counsel for Commonwealth agreed. Although the court has given the plaintiff ample opportunity to develop any evidence to the contrary, the court finds that, after the completion of discovery in this matter, Commonwealth has adduced no evidence to indicate that the language in the relevant "Whereas" clause in the August 31, 2004 agreement was intended to evince the intent of the parties with regard to the meaning of the term "perform" as used in the Real Estate Purchase Agreement or to change the meaning of that document in any way.

Therefore, the court finds that there is absolutely no evidence to support the notion that the August 31, 2004 side agreement was intended by any of the parties to supersede, modify, supplant, or even to explain or elaborate upon the language of the Real Estate Purchase Agreement. Instead, the evidence is undisputed that the August 31, 2004 agreement was intended solely to ensure that Commonwealth would receive the benefit of WWW's agreement with WMC, which provided that WMC would be responsible for a portion of the cost of the Proffer Work.

The court also finds that the language of the agreement itself fails to support the

plaintiff's contention that the allocation language refers to some allocation of the cost of the Proffer Work between Commonwealth and WWW. Instead, the court believes that the absence of any attempt in the agreement to define precisely how such costs would be allocated between the parties supports the proposition that the only reasonable interpretation of the agreement is that the costs are allocated solely to Commonwealth.[4]

Based upon the court's previous ruling that the plain language of the Real Estate Purchase Agreement was rendered ambiguous only when considering the seemingly inconsistent language in the August 31, 2004 agreement, the court's finding and conclusion that the parties had no intent that the August 31, 2004 agreement would supersede or otherwise inform an interpretation of the Real Estate Purchase Agreement is arguably case dispositive. Thus, it would appear to no longer be necessary for the court to consider extrinsic evidence in order to determine the intent of the parties with regard to the cost of the Proffer Work. On the other hand, in its earlier memorandum opinion, the court did invite the parties to present extrinsic evidence with regard to their intent when entering into the Real Estate Purchase Agreement in September of 2003. Therefore, the court will proceed to a consideration of that evidence in light of the court's conclusion as a matter of law that the August 31, 2004 agreement was not intended to amend or explain the Real Estate Purchase Agreement in any way.

---

[4] The inconsistency between Commonwealth's position that the agreement allocates the cost of the Proffer Work to both Commonwealth and WWW and the actual language of the agreement is highlighted by the different sums requested during the course of this dispute. In the September 2005 meeting, the plaintiff requested payment from the defendants in the amount of one half of the total cost of the Proffer Work in excess of $1.2 million. This same figure was the demand in the original complaint filed by Commonwealth. In the amended complaint, however, the plaintiff changed its demand to the total amount of the cost of the Proffer Work in excess of $1.2 million, or alternatively some reasonable allocation to be determined by the court. Thus, it appears that even Commonwealth is unable to assign any definite meaning to the "allocation language" other than that evinced by the e-mails leading to the adoption of this recital.

## IV.    The Real Estate Purchase Agreement

The defendants contend that there is no evidence to indicate that the parties agreed that WWW would be responsible for the costs of the Proffer Work in excess of $1.2 million for two reasons. First, neither party ever considered the possibility that the cost of the Proffer Work would exceed $1.2 million; and second, the defendants specifically did not agree to pay any such amount. The defendants concede that the plaintiff may have believed that its total exposure for the cost of the Proffer Work would not exceed $1.2 million. But, according to the defendants, this was based upon Commonwealth's belief that the estimates available to it at the time the parties entered into the Real Estate Purchase Agreement indicated a cost substantially lower than $1.2 million. Therefore, the defendants maintain that the plaintiff has failed to satisfy its burden of forecasting evidence to support its assertion that there was an agreement between the parties that WWW would be responsible for the payment of any Proffer Costs in excess of $1.2 million or that WWW has breached such an agreement by failing to make any such payments.

In support of their argument, the defendants quote the following language from Galloway Corp. v. S. B. Ballard Constr. Co., 250 Va. 493, 503-04 (1995):

> When resolving a dispute between the parties to a contract with a latent ambiguity, the court may first consider, among other things, whether negotiations and prior dealings of the parties manifested their intent with respect to the ambiguous term. If the parties both manifested the same intent with respect to the ambiguity, that intent will be enforced. If, on the other hand, the parties do not manifest the same intent regarding the ambiguity, there has been no meeting of the minds on that term of the contract, and the intent of one party will not control.

In Galloway, the plaintiff, a general contractor, had apparently intended that each of its contracts with its subcontractors would include an absolute "pay when paid" defense. 250 Va. at 504. The Court found that only if a particular subcontractor manifested the same intent would the defense

16

actually be available to the plaintiff. Id. Under Galloway, therefore, any evidence with regard to the intent of Commonwealth alone would not be sufficient to obligate WWW for the cost of the Proffer Work in excess of $1.2 million. Instead, Commonwealth would have to demonstrate that both parties shared the same intent with regard to any future overages.

The evidence submitted to the court in connection with the defendants' motion for summary judgment clearly supports the defendants' contention that none of the parties believed the cost of the Proffer Work would exceed $1.2 million. Tim Scoggin, who negotiated the deal on behalf of Commonwealth, testified in his deposition as follows:

> Q. I believe it's your testimony that nobody, not you – you never thought about what if it cost more than 1.2 million?
>
> A. That's correct.
>
> . . .
>
> Q. And therefore, you never heard Mr. Wilkins agree that if the proffer work cost more than $1.2 million, that the sellers would pay for that?
>
> A. As I said, I don't think he and I ever contemplated, which would have meant we would not have discussed at the contract stage, any dollars over $9.2 million. I don't remember any discussion.
>
> . . .
>
> Q. Okay. You never heard Mr. Wilkins agree on behalf of the sellers that if the cost of the proffer work to Commonwealth exceeded $1.2 million, that the sellers would pay for that?
>
> A. No.
>
> Q. And you never said to Mr. Wilkins, if the cost of the proffer work exceeds 1.2 million, I expect the sellers to pay for that?
>
> A. At the stage of the deal that we're talking at now, this time frame, there was zero discussions between me and Jim that related to either he or I spending over $9.2

17

million.

See Defendants' Brief, Exhibit 29 at 41-42. The broker, Shaun Petracca, also seems to remember

a lack of discussion of the possibility of costs in excess of $1.2 million. See Defendants' Brief,

Exhibit 27 at 110 ("I don't recall a conversation about that. I do recall that there were a number

of assurances that were given to us by Chuck Maddox and PHRA about the costs at 1.2 probably

being high, and there was more discussion about what to do with the dollars that were left and

the reimbursements of dollars that we may get from different entities than there was about the

cost being over $1.2 million.").

James Wilkins, who negotiated the contract for the defendants, had this to say about the

estimates of the Proffer Costs:

A.    . . . So my assurances, and what our thoughts were, is that the million two was
      generally going to cover the proffers. We never assumed spending more. We
      looked at it as, what happens if he spent less than that. And that's pretty firm
      because the way we argued, negotiated and discussed in the contract.

. . .

Q.    Because you had gotten the estimates that you had from Chuck Maddox, everyone
      assumed that the proffer work would be something below a million two; correct?

A.    We assumed that his estimates were accurate. . . . All I was trying to do in that one
      statement was, if you were able to get really good estimates and spend less than a
      million two, what are you going to do. If it came out over a million two, that's
      going to be his problem.

Q.    Yeah, and that's why – I mean, paragraph four doesn't even address the possibility
      that it might be over a million two.

A.    No, but that's basically what he assumed.

Q.    That's what who assumed?

18

A.   If it was less than a million two, he would spend up to that amount. If it was over a million two, that would be his difficulty.

. . .

Q.   But it doesn't contemplate or address what happens if the cost of the proffers is over a million two?

A.   No, because he had agreed and realized that he was assuming all of the proffer work. He actually volunteered that he would do all the proffer work, including the proffer work in the front of our remaining 30 acres. He volunteered that. We didn't even ask him that.

See Defendants' Brief, Exhibit 28 at 45-48. In fact, Wilkins stated that the parties both agreed that the buyer should handle the proffer work because Commonwealth was qualified to do so and the sellers were not, and that WWW would sell the property "at a wholesale basis and he [Tim Scoggin] could do all the proffers." Id. at 35.

The plaintiff, on the other hand, contends that there is evidence sufficient to raise a dispute of material fact in this case with regard to the parties' intent that should preclude a grant of summary judgment. In his deposition, Tim Scoggin made the following comments with regard to his understanding of the parties' intent:

A.   . . . Jim and I's agreement is that $9.2 million and 40 acres.

. . .

Q.   So that the actual contract that you signed to acquire the property provides that Commonwealth would purchase 40 acres for $200,000 an acre?

A.   I cannot answer to what the contract itself says. I did not draft it and I'm not an attorney. I can tell you the intent of the contract was that we would pay the Wilkins $8 million in cash and perform $1.2 million worth of proffer work for a total of $9.2 million. Now, the contract itself, it'll have to speak for itself.

. . .

19

Q.      You would agree that it does provide that no less than $1.2 million will be spent on offsite work, right?

A.      I'm going to agree that the words are the words on this piece of paper. And if you want me to read the sentence, I'll be happy to, sir. But my instructions to the people that construct these documents was eight million and one point two. And mine and Jim's concern was that we spend the whole $1.2 million. And after that, I really don't have any specific recollection of ever dealing with any words on this document other than my signature on the back.

. . .

See Defendants' Brief, Exhibit 29 at 35-39. At the deposition of Milton Turner, counsel for the defendants and Turner had the following exchange with regard to the plaintiff's intent and the contract documents:

Q.      The document behind tab four [Real Estate Purchase Agreement] is silent as to what happens if the proffer costs exceed 1.2 million?

A.      The document behind tab four alone is silent - -

Q.      Okay.

A.      - - on the issue of cost overruns.

Q.      Other than the document behind tab 26, the agreement entered into August 31, 2004, are there any other documents that you need to read in conjunction with the documents behind tab four to conclude that the defendants are responsible for the proffer costs?

A.      I think that's a legal question. But I think you have to read the, what is it, the June LOI. I think you have to follow the trail of these documents through to ascertain what should have been written clearly. But because it's not clearly written, I think you've got to look at all of those documents. But again, I think that's a lawyer's question, not something for - - we are certain we entered a deal with your clients where we were not exposed for more than a million two on the proffer work. . . . But I am satisfied that the plaintiff made a deal where they were capped at a million two on the proffer work. And I can't sit here and tell you all the documents to look to for that. I think that's a legal issue.

See Defendants' Brief, Exhibit 30 at 126-27.

Commonwealth contends that its evidence demonstrates that it had the understanding, at the time it entered into the Real Estate Purchase Agreement, that its exposure for the total cost of the Proffer Work would be limited to $1.2 million and that it believes this was the mutual intent of the parties. The defendants respond that the plaintiff's evidence goes only to its own intent and does not create a dispute of material fact with regard to the parties' mutual intent. The court also notes that the deposition testimony of Scoggin and Turner seems to indicate that both individuals were not clear that the language of the Real Estate Purchase Agreement that was drafted by their attorney and signed by Commonwealth explicitly reflected their belief that their exposure would be limited to $1.2 million.

Commonwealth next points to the July 14, 2003 letter of intent between the parties which did state that the parties had preliminarily agreed to a total sale price for the property of $9.2 million which represented "the purchase price for the real estate, as well as the development costs associated with the Buyer and Seller's intended use for the Property." In other words, the letter of intent would have limited Commonwealth's exposure for the cost of the Proffer Work to $1.2 million. The plaintiff contends that this preliminary understanding indicates its intent to cap its total cash outlay for the property at $9.2 million. However, the court notes that the terms reflected in the letter of intent were quite different than those included in the final Real Estate Purchase Agreement, which did not include such a cap. This change in terms supports the defendants' contention that they did not agree to the cap included in the letter of intent and indicates that Commonwealth was also aware that their exposure would no longer be explicitly

21

capped.[5]

The plaintiff also points to the following deposition testimony of Wilkins in support of its

assertion that the parties had both agreed that the terms in the letter of intent reflected their

underlying agreement:

> So Tim was trying to rush things as much as he could to meet Wal-Mart's time schedule.
> And that's why on that one memorandum, the memorandum of understanding that asked
> that we give them 45 days where we wouldn't sell it to anyone else and so forth, it was
> really done so he could take it to Wal-Mart to say to them, I've got the property under
> contract and this is what we've agreed to.

See Defendant's Brief, Exhibit 28, p. 40:16-23. The language the plaintiff focuses on is "this is

what we've agreed to" to allegedly indicate that the letter of intent reflected the parties' actual

agreement at that time. But the court notes that Wilkins goes on to state as follows:

> I even questioned our attorney at the time, I said, I don't like to worry about this - yeah.
> . . .
> See, I'm not comfortable with this wording, because it says here, Sale price of 40 acres
> shall be the sum of $9,200,000. That's not what we agreed to. We agreed to – that we're
> selling the land for 200,000 an acre plus him doing the proffers. And Commonwealth, of
> course, had written this up and sent it to us and were calling on Rick, I've got to have it –

---

[5] The defendants' view is also supported by the July 21, 2005 memorandum prepared by Wendell Thomas
at the request of Milton Turner in which Thomas analyzed the possible legal remedies available to Commonwealth
after it became aware of significant overages. The plaintiff specifically waived attorney-client privilege with regard
to this memorandum. With regard to the Real Estate Purchase Agreement, Thomas stated: "Section 4 of this
document provides that the Commonwealth will perform the off-site work that is described in the proffers. Without
more, this document would make it very difficult to collect the cost of any off-site work from the Seller." See
Defendants' Brief, Exhibit 19. Thomas also refers to a draft Real Estate Purchase Agreement and notes: "This is our
draft of the Real Estate Purchase Agreement that uses the 'total investment' approach to the agreement between the
parties. This draft was not accepted by the seller." Id. (Emphasis added.)

The plaintiff contends that this memorandum was prepared primarily to respond to Turner's interest in
exploring possible claims for fraud and negligent and/or intentional misrepresentation with regard to the earlier
estimates of the cost of the Proffer Work, and was not intended to be a thorough and complete legal analysis of the
agreements at issue. The court notes, however, that the memorandum examined all of the relevant documents related
to the sale of the property as well as the possible legal claims of mutual mistake and misrepresentation and was
prepared by the very individual who drafted the Real Estate Purchase Agreement. Nevertheless, the court agrees that
this memorandum is not case dispositive, and that it represents only one piece of evidence supporting the defendants'
contention that the parties did not have the intent that the Real Estate Purchase Agreement would require WWW to
pay any amount toward the cost of the Proffer Work. It does, however, confirm that defendants rejected any contract
in which Commonwealth's exposure for an overage was explicitly capped.

got to have it back. Mr. Butler assured me, as did Shaun, that the contract would be the only thing that would count. This wouldn't really count, because this was just being done for Wal-Mart's basis. It was not what we had agreed to. We had agreed to 40 acres at 200,000 an acre plus them doing the proffers, and he said that will – the contract will supersede all this. The contract will be the only thing that will actually count. . . . So those were signed on that basis, and that was the only reason that this memo was even done, and that's why it was done on their letterhead, not done to seal up any contractual agreement with us, just strictly so he could have something to go to Wal-Mart with.

See Defendant's Brief, Exhibit 28, pp. 40:23-42:5.

When considering that portion of Wilkins' testimony upon which the plaintiff relies in light of his testimony regarding the letter of intent as a whole, the court finds that Wilkins was not indicating that the letter of intent represented mutually agreeable terms. Instead, the court finds that Wilkins was explaining the purpose of the letter of intent and the reason WWW signed the letter of intent even though its terms did not in fact reflect the deal the defendants believed they had at that time. Therefore, the court concludes that Wilkins' deposition testimony does not raise any dispute of fact, material or otherwise, with regard to the parties' intent.

Both parties have also pointed to evidence regarding events which took place after execution of the Real Estate Purchase Agreement in support of their positions. The defendants note that even after Commonwealth became aware that the cost of the Proffer Work would exceed $1.2 million, which they learned during the summer of 2004 prior to closing on the sale, Commonwealth never approached WWW to discuss a possible contribution until the meeting called by the plaintiff which took place on September 27, 2005. This is evidenced by the following exchange during the deposition of Tim Scoggin:

Q.    Now, prior to closing in August of '04, you testified that by June of '04 you knew that the WWW share of proffer work, the new estimates were now up to $1.6 million, something north of $1.6 million, right?

23

A.      Yes, sir.

Q.      All right.  Did you at that time, prior to closing, ever go back to Mr. Wilkins and say, Jim, we now know it is going to cost more than $1.2 million.  What are we going to do about that?

A.      No, sir.  Not to my knowledge, I did not.

Q.      Why not?

A.      Couldn't answer that.

See Defendants' Brief, Exhibit 29 at 43.  Scoggin further testified that at the meeting on September 27, 2005, the parties were trying to determine "whether there was some common ground between Commonwealth and the Wilkins as to how to handle the cost overruns." Id. at 50.  Milton Turner apparently proposed a figure that he believed would be a good compromise, however no specific proposal was set forth at the meeting.  Id. at 51.

The defendants contend that this evidence supports the proposition that Commonwealth closed on the deal knowing that the cost of the Proffer Work would exceed $1.2 million, never approached WWW to explicitly set out an allocation between the parties, and knew that it was responsible for the overage.  The court finds, however, that this evidence cuts both ways.  While the plaintiff's knowledge of the overage prior to closing and its failure to address the overage in a separate document may indicate its understanding that it was responsible for that overage, it is equally likely that this evidence might demonstrate that Commonwealth already believed WWW was responsible for some portion of the overage and did not feel the need to address it at that time.  Therefore, the court does not find this evidence helpful in assessing the parties' intent.

Commonwealth contends that whether or not the parties actually contemplated the

24

possibility that the cost of the Proffer Work could exceed $1.2 million, the Real Estate Purchase

Agreement that was actually signed does accommodate that possibility. The plaintiff also asserts

that it has produced evidence of internal documents which support its assertion that

Commonwealth believed its exposure for the cost of the Proffer Work was limited to $1.2

million. First, Commonwealth points to the following statement made by Ronald Wislowsky, an

engineer working on the project, to Becky Wright, Commonwealth's in-house engineer, in an e-

mail dated March 1, 2005:

> Becky,
> what is the schedule for the Wal-Mart opening? We are trying to finalize the Rte 50
> improvements schedule.
> additionally, on the Rte 50 contract, I think that WWW and WMC will be ready to sign a
> contract with BLD, the successful low bidder in the next two weeks or so. They are
> going to want Scoggin to sign the contract also. Any issues with this? As your interest in
> the improvements is capped at 1.2 mil, do you want to be briefed on the efforts to get the
> costs down?

See Plaintiff's Memorandum in Opposition, Exhibit A. Becky Wright responded that she did

want to speak with Wislowsky on the Route 50 improvements, but did not comment on the cost

of the improvements. Id.

Commonwealth also notes that a draft pro forma financial statement on the project, which

was prepared by Commonwealth to submit to Regions Bank, shows an expected reimbursement

from WWW in addition to the expected reimbursement from WMC.[6] See Plaintiff's

Memorandum in Opposition, Exhibit B. Finally, Commonwealth points to an email exchange

between Kelley Mikels at Commonwealth and Shaun Petracca from November 14, 2005 to

---

[6] Out of total site costs of $11,895,238, the pro forma showed Wal-Mart reimbursements of $4,954,500.00,
WMC reimbursements of $1,348,492.11, and WWW reimbursements of $1,678,755.89, for a total net cost to
Commonwealth of $3,913,490.

November 18, 2005 in which Mikels asks for Petracca's correspondence related to the off-site work and states that "I know it has something to do with the fact that the estimates are off by about $2m, and we are only obligated by Agreement to pay $1.2m of the now estimated $4m, and they are not willing to pay the overages from their estimates." See Plaintiff's Memorandum in Opposition, Exhibit C. According to Commonwealth, all of this evidence demonstrates that Commonwealth believed it was responsible for no more than $1.2 million of the costs of the Proffer Work.

The court agrees that this evidence may demonstrate that, at least at some point after the parties had signed the Real Estate Purchase Agreement and closed on the sale, certain individuals at Commonwealth then believed they were only obligated to pay $1.2 million toward the cost of the Proffer Work. In fact, at his deposition, Milton Turner stated that "I believe that and the other agreements caps us at a million two. As your client Mr. Wilkins told me, there was never any thought it would cost this much money. They never even gave any thought to it being over." See Defendants' Brief, Exhibit 30 at 123. Nevertheless, the court finds that this evidence does not indicate a material dispute of fact with regard to the parties' intent at the time they actually entered into the Real Estate Purchase Agreement.

None of the individuals who generated the e-mails noted by the plaintiff were actually involved in the negotiations for the sale of the property. It also appears that Turner himself only became involved in the project once it was clear that the cost of the Proffer Work was exceeding the original estimates. He was not involved in the actual deal itself. Therefore, the court finds that the documents upon which the plaintiff relies, which were generated after the fact by persons who were not involved with the negotiations and who obtained their information secondhand, are

26

not particularly reliable. Furthermore, all of this evidence speaks only to Commonwealth's intent. It may be that Commonwealth's employees, as well as its chief manager, believed that Commonwealth expected its total outlay in this real estate purchase to be $9.2 million or less based upon the estimates it had received from the engineer. Taking all of these factual inferences in a light most favorable to plaintiff, however, this evidence does not demonstrate the parties' mutual intent for WWW to actually pay for any overage.

In order for there to be a genuine issue of material fact which would preclude a grant of an otherwise proper motion for summary judgment, the evidence, when considered as a whole, must be such that a reasonable jury could actually return a verdict in favor of Commonwealth, the non-moving party. See Scott v. Harris, 127 S. Ct. 1769, 1776 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Here, the evidence is overwhelming that the parties did not intend for WWW to be responsible for payment of any of the costs of the Proffer Work, other than in its role as a collection agent for the WMC payment. Commonwealth has adduced no hard evidence to support its version of the parties' mutual intent. Commonwealth attempted to have the defendants sign an agreement which would have limited its exposure for the cost of the Proffer Work, as reflected in the letter of intent and the draft purchase agreement, however the defendants explicitly refused to sign any document with such terms. Furthermore, the plain language of the Real Estate Purchase Agreement simply does not admit the possibility of WWW bearing a share of the cost of the Proffer Work, and the court has previously found that the August 31, 2004 agreement did not amend, supersede, modify, supplant, or even explain or elaborate upon the language of the Real Estate Purchase Agreement. Even if the court were to find that there was no meeting of the minds on any overage, the only reasonable interpretation of

27

the Real Estate Purchase Agreement is that the agreement provides that Commonwealth assumed responsibility for the entire cost of the Proffer Work.

The plaintiff argues that, if the court finds that there was no meeting of the minds, the court can supply an omitted term in an otherwise valid contract, citing <u>Vega Investments Corp. v. Gorge</u>, 49 Va. Cir. 343, 1999 WL 796651 (1999). The Court in <u>Vega</u> had supplied a provision in a contract for the sale of land requiring termination within a reasonable period of time, where the contract omitted a period for termination, citing the Restatement (Second) of Contracts, § 204 which states as follows:

> When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

<u>Id.</u> at *2.[7] Comment (b) to the Restatement describes how such an omission may occur:

> The parties to an agreement may entirely fail to foresee the situation which later arises and gives rise to a dispute; they then have no expectations with respect to that situation, and a search for their meaning with respect to it is fruitless. Or they may have expectations but fail to manifest them, either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse.

While the court agrees that Virginia law might permit a court to insert an omitted term under certain circumstances, it is not necessary to do so in this case because there is no omitted term that is essential to a determination of the parties' rights and duties. It would only be necessary to apply the principles set forth in the Restatement if the court was attempting to

---

[7] The plaintiff has not identified, nor has the court discovered, any greater authority in Virginia for this notion. Nevertheless, the court will assume, for the purpose of this motion, that Virginia courts in general would apply the principles set forth in the Restatement.

28

implement a provision in an agreement that the parties had already contemplated in part, i.e., the right to termination without a time period set for such termination. But here, there is no such gap for the court to step into. The court does agree that neither party believed that the cost of the Proffer Work would exceed $1.2 million at the time they entered into the Real Estate Purchase Agreement. Nevertheless, the record does not reflect that Commonwealth successfully shifted the risk of any overage to WWW. Neither is the contract simply silent on this term. Instead, as previously stated, the Real Estate Purchase Agreement imposes that risk on Commonwealth alone, a risk it was apparently willing to bear based upon the estimates available at the time and given the defendants' unwillingness to accept an agreement which would have required them to share in that risk.[8] The parties here failed to finalize a deal akin to that set forth in the letter of intent and instead entered into the Real Estate Purchase Agreement, which explicitly omitted the total investment approach sought by the plaintiff. Therefore, the court concludes that this is not the type of case that should be governed by the Restatement in that there is no missing term, material or otherwise, with regard to any overage in the cost of the Proffer Work.

Although Commonwealth may have adduced evidence indicating some disputes between the parties with regard to the facts of this case, it has failed to forecast evidence sufficient for a finding that a reasonable jury could decide in its favor on the remaining claim for breach of express contract. Therefore, the court concludes that there remains no genuine dispute as to a

---

[8] The court also notes that, under the plaintiff's theory of this case, WWW could be held responsible for the cost of the Proffer Work in excess of $1.2 million up to an unlimited amount. Under such a scenario, Commonwealth could conceivably have waited to begin the Proffer Work for a period of several more years, at an even higher cost, and WWW would still have been responsible for the entire amount of the overage, which would have been due solely to the plaintiff's delay. The court finds that such an interpretation of the agreements between the parties is not reasonable nor consistent with the intent of the parties, considering that Commonwealth retained sole discretion over the timing of the performance of the Proffer Work and the selection of vendors.

material fact in this case, and the defendants' motion for summary judgment must be granted.[9]

## **CONCLUSION**

Considering all the evidence submitted in this case, the court finds that the plaintiff has failed to raise a genuine dispute of material fact with regard to the key issue of whether the agreements signed by the parties provide that WWW is responsible for payment of any portion of the cost of the Proffer Work in excess of $1.2 million. Instead, the court finds that the evidence overwhelmingly supports the defendants' claim that the parties did not intend that WWW should bear the risk of any overage in the cost of the Proffer Work. As a result, the plaintiff's claim for breach of express contract for nonpayment of that cost must fail, and the defendants' motion for summary judgment will be granted.

The Clerk of Court is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This _31 st_ day of March, 2008.

_Jack Conrad_
_____
United States District Judge

---

[9] Based upon the court's holding, this case will not proceed to trial. As a result, the plaintiff's motion in limine will be denied as moot at this time.

30